Good morning, Your Honors. Tom Freeman on behalf of McGuire Woods. I will be taking 8 minutes and reserving one of those 8 for rebuttal. Counsel here for the Zwirling firm will be taking 7 minutes. And Ms. Grignion for the Dissner Estate will be ceding her time to McGuire Woods. Your Honors, in 2007, the district court judge in this case awarded attorney fees to McGuire Woods based on a Lowe star that accounted for almost 14,000 hours of work over a 4 year period of time. In a case that had very high risks and was a difficult case in which there was no government path breaking of the underlying substantive issues. The district court judge characterized the opposing defense counsel as resourceful and formidable defendants. And the district court judge awarded the Lowe star plus a multiplier with a cap. The district court judge made that award after he had found that the incentive agreement that had been used by McGuire Woods and his predecessor was improper. And yet he still determined that the McGuire Woods firm had earned those fees on a case in which a settlement was beneficial to the class, as the prior panel said, no matter how you slice it. A $49 million award of fees plus injunctive relief. This was a large victory. I'm smiling because I thought that would be a quote that we would hear somewhere along the way in the course of this case when I read it. I thought Brother Reel is going down in history. I will try to refrain from saying it too many more times now that it has been noticed. But yes, we do have a sentence that you're going to hold our gather. It doesn't roll off the tongue quite easily. However, the Ninth Circuit sent the case back to Judge Reel because they wanted him to analyze whether under California law, the fact that the incentive agreement violated the California rules against representing clients with conflicting interests, whether that has an impact on the amount of the attorney fees. And so they sent the case back to Judge Reel. And unfortunately what happened was the district court judge misinterpreted California law. Now, it is in some sense somewhat understandable how that would happen because California law was not clear until about 12 years ago. And there are, as we pointed out in our brief, there is the Ninth Circuit decision, image technical, which does seem to apply a per se standard. Let me just ask you first. Because I looked at Rodriguez-Wen very carefully. And that case came as very close or perhaps when it actually did state there is an actual conflict of interest here. The interest of the class reps and the rest of the class are in conflict. Now, Image Tech addresses that situation and says, after the forfeiture. And I looked at the California cases you cited and they were either talking about a potential conflict of interest or it wasn't a conflict of interest at all. And so I was looking for a case that said, even when there is an actual conflict of interest, you need to think about these various factors. What case is that? And I will explain that it is Pringle, but it will take a little bit of explanation. And first of all, this does give me a chance to do a mea culpa here. In my brief, I described the Martirosian case as involving an actual conflict and it involved a potential conflict. And I apologize for that. But in the Pringle case, there was an actual conflict. In fact, it is stated in the facts of the case. I believe I cited the page number in the brief where that comes from. But now there is a dispute about, well, does Pringle really apply? Is this really a holding in Pringle? And the answer is that under California law, it is a holding because Pringle determined as an alternative basis for its resolution that the record that it had in front of it was insufficient to determine whether counsel had engaged in the type of egregious violation that is required. So it had assumed for the sake of the alternative holding that there had been a violation. And the conflict that was alleged was a direct conflict. In fact, it was described, the interests of the clients were described as conflicting in the attorney's letter to one of the parties. So I believe that that does deal with a direct conflict, although I would also question whether it makes a difference as to whether the conflict is a direct conflict or a potential conflict. I do not think it is a direct conflict because under the California rules of professional conduct, both are prohibited. And I believe now in the image technical case, that case came out before Pringle was decided. So the court there did not have the benefit of that analysis. And the Pringle case, which has been cited with favor and followed in subsequent cases, addresses the issue head-on when it says that a party in that case had argued that there was an absolute prohibition that if there was a conflict of interest, it is obviously prohibited, but there is an automatic forfeiture. And the Pringle court said no, there is no automatic forfeiture. What you have to do is you have to look at the conduct of counsel to see, and this is in a no harm case, and that is important, to see if the conduct was sufficiently egregious to justify a forfeiture of the attorney's fees in that case. And this, by the way, is consistent with the restatement, which also applies a similar standard and is also cited in Pringle and the other cases. And now I say that it is important to say it is a no harm case, because that is a point that was relied on. This isn't a situation where the client has lost something. And so there may be concerns about compensating the client for X number of dollars that it lost out of pocket. There is no harm in this case, and I could quote the panel opinion in a couple of places when they described the result here as involving no harm. There was an improper agreement, and that shouldn't have happened, but it did not cause any harm. The settlement was fair and adequate. You know, you can emphasize it, and we're going to certainly listen to you, but sometimes when you make an agreement on how you're going to pay somebody, it might have something to do with whether you get the case at all in the first instance. So when we say no harm, I understand why you argue it, and you ought to argue it. You ought to argue whatever you can that would benefit your client. But this case isn't going to turn on that point, do you think? I think the standard turns on that point. In other words, under Pringle... We won't know. Under Pringle, if there is no harm in the sense that they mean in Pringle, obviously there is in some sense always a harm if your lawyer is representing clients with conflicting interests. But Pringle says that is not enough, because that would be a per se rule. And that, by the way, is where we believe Judge Reel in his alternative ruling erred, because he basically found that even if he applied Pringle, there was a serious ethical violation in this case. And we don't believe that that is how Pringle... That's what Pringle means when it says there must be an egregious conduct by the lawyer. What do you want us to do specifically? Well, we would ask that this Court send this case back to Judge Reel to enter the award of... For a third time. Actually, we would ask that it just be entered, that his original award... That's off the table. Okay. The prior panel decision took that off the table and said this needs to be considered. And you're suggesting, but no, it doesn't need to be considered. You've got to go back to what happens before you consider it. That's not a possibility. So what's your realistic option here? Okay, so, well... The rule all over again? The case is a bleak house. How many years is this going to go? I don't think anybody... Nobody's happy about it, but practically, what direction, if we accept your argument and decide, okay, it has to be sent back, we need to give very specific directions to keep from having this happen all over again. So what would those directions be? Yes, and we believe that under Pringle, there is no basis for any forfeiture, because the violation didn't meet that standard. It was not an egregious violation. The district court found that it was egregious, right, in its alternative ruling. He said it was a serious violation because the client's interests were... There were conflicting interests among the class. So do we say that that's a legal error, or do we say that there's clearly erroneous facts, or how would we distinguish that? Well, we said that it was a legal error because looking at his... And it wasn't particularly analysis. It was just... There was just a statement in the record, and that statement was really, we believe, a restatement of the per se rule. In other words, he said there were conflicting interests of the clients, and that's a serious error. Well, the test is not whether it's serious, because all, as Judge Ferris pointed out, all conflicts of this type are serious. The question is whether this is a gross violation of duty, and one of the requirements is that there be a clear legal rule that was violated, and at the time... Judge Miles, when you said, as I said, what you might say is that you might conclude that from something from my questions, but questions suggest that when we don't... I certainly was not... ...about our decision until we make it, and usually that's when we write. Judge, and Judge Ferris, I was certainly not implying that you are agreeing with our position here, and so I finally implied that I certainly apologize. But the point I'm trying to make is that under this Pringles standard, there has to be a violation of a clear rule that's already there. Now, when Judge Real decided that this agreement didn't, you know, that this was an improper agreement, that was an issue of first impression, and a reasonable lawyer in the position of the McGuire-Woods attorney at the time, or their predecessor, would not have assumed that this was improper. There were... and there were several reasons for that. It's not launching into a new topic, because you're actually well into your colleague's time, so... I'm sorry. If I'm into my colleague's time, I will proceed that time. Good morning, Your Honors. May it please the Court. My name is Dan Drockler. I'm counsel to Zwirling Schachter and Zwirling, one of the class counsel in this case. I just wanted to take a couple of minutes to discuss the Zwirling appeal as to the elimination of the risk multiplier by Judge Real on remand, and to remind the Court, of course, that we are here on the remand for part of the prior panel's decision, which the Court asked the lower court to consider aspects of the fee award to class counsel. We did not have the type of incentive award agreement or retainer agreement that McGuire-Woods had, and, in fact, that is not an issue with respect to our appeal. What we believe happened is that Judge Real erred as a matter of law, but he certainly abused his discretion in failing to follow the precedence of this Court, and in particular of the Fischel v. Equitable Life case, which was a 2002 decision of this Court, in which this Court held that it is an abuse of discretion to fail to apply a risk multiplier in the following situation. One, where the attorneys take a case with the expectation that they will receive a risk enhancement if they prevail. Two, their hourly rates do not reflect that risk. And three, in fact, there is evidence that the case was risky. Now, in 2007, when Judge Real first ruled on this case, he found all of those factors were met. On remand, when he was revisiting the swirling portion of the appeal, of the fee, he did not find any of those things to the contrary. He made no findings with respect to whether or not the case was risky. Those findings remained. And all that he did when he revisited the award was that he took, in addition to the hourly rates that he had already had from the swirling firm and from all of the class counsel, he asked for the detailed time bill. And that was submitted to the Court on remand for the first time, although it was offered to the Court originally. He only asked for it on remand. And what he determined at that time was that the fee would be reduced for excessive fees and non-compensable work. Now, he did then two things. He reduced the load star by 10 percent, a decision that we think was wrong but we don't appeal. And on top of that, he then eliminated the multiplier risk enhancement entirely, essentially penalizing the firm twice. And we know for a fact that all three of those risk enhancement considerations were met, despite, I believe there was one objector who filed a lengthy discussion of discussing rates. However, Judge Reel never changed that, his opinion. He certainly never said anything in his following opinion that would contradict his finding in 2007, when he explicitly found that class counsel's hourly rates were reasonable. And I recognize that I'm exceeding the time here. So let me finish it, and I still would like to reserve a minute, if possible, for rebuttal. But I would say that the District Court, in reviewing and revisiting the fees, abused its discretion in connection with eliminating the risk multiplier. In failing to follow this Court's admonition that it's an abuse of discretion to fail to award that multiplier in circumstances which were identical, in fact, to the ones that we met in this case, which was indeed a risky case, as Mr. Friedman pointed out. It's a risky case. The other two pieces of the Ninth Circuit's decision, we might infer that the litigation was taken with an expectation of a risk enhancement, or might infer that the hourly rates did not reflect the risk of nonpayment. But where is that established? Well, that certainly is in the record. I don't have the record in sight, but there were submitted with the fee request, there were declarations from counsel that indicated that we took this case on a contingent basis, that we expect that we typically get a risk enhancement, there is that expectation, and that the hourly rates that we charge on this case are the same rates that we charge in any of our cases. And so those criteria were met certainly the first time on the fee award, and there was nothing that Judge Reel even raised with respect to those two elements on the remand when he revisited. In essence, he looked at the time records and came up with, he identified some specific items that he felt warranted a reduction in the fees, and I suppose he mentioned that there was, he believed that there was excessive billing, but he never refuted his own determination regarding the requirements for a risk multiplier, but merely in what I believe is an abuse of discretion, just eliminated the risk multiplier, contrary to the holdings of this Court both in Fischel as well as other cases that determine the... What, in your view, are we supposed to do, and what would be the basis for it? What we believe should happen here is that we think that this Court has the ability to resolve this, all of these disputes in your determinations of all of the appeals, and we would request that you do so. We don't think it makes sense to be sent back down to the district court, nor do we believe it is necessary under Ninth Circuit precedent. We believe, though, that there was a determination that was reversed when Judge Reel awarded a multiplier of 1.75. He used, by the way, some of that criteria when he was revisiting. For instance, he mentioned in his decision that our fees would not exceed the 25 percent cap that he had awarded in the prior decision, and what we would ask this Court to do is to reinstate or to award a multiplier of 1.75 up to a 25 percent cap on all of class counsel's fees. But the number of hours more than doubled. Well, that was taken into consideration by the district court both the first time... You're telling us to disregard it. You want us to apply the determination they made the first time with regard to multiplier and reasonableness and so forth and just accept the fact the number of hours doubles, more than doubles. Well, I believe that the district court anticipated that. That's why his original award said that the award would consider the multiplier on the Lodestar through the effective date, which is the date that the decision became final. That date, as defined in the settlement agreement and accepted by the court... The risk was the same? The risk... Well, it certainly turned out that way. But the risk, indeed, was significant. But more importantly, Judge Reel, in perhaps an odd way... I think there's a problem in saying you don't have to do anything but take half of this decision and part of this decision and put them together. Well, we're not asking that. What we're asking is for the original decision to be recognized. That original decision anticipated that the Lodestar would continue through the effective date. All that we are saying is... And by the way, Judge Reel did... He may have done it backwards, but he did what is perfectly acceptable by the Ninth Circuit and most other circuits, which is that he applied the benchmark as a test. He said, you're not going to exceed 25%. And that is the benchmark in this circuit, and certainly an acceptable amount, maybe towards the low end of what class counsel receive in an award when there is a percentage of the funds. And all that we're asking is that that limitation be recognized. Sorry, finish what you were saying. Well, all that we're asking is that that limitation and that decision be taken as a whole. We're not asking for half and half. We're asking for that decision to be taken as a whole, which anticipated that there would be additional time. Judge Reel recognized that there would likely be an appeal and that there would be a tremendous number of issues surrounding the administration of this class action, and that it all be held in by that 25% cap so that we wouldn't exceed the benchmark. So my concern is we told the district court in Rodriguez 1 to revisit all aspects of the fee award. We didn't say it was vacated, but we came very close to saying that. Why wasn't the district court entitled to just review everything afresh given our instructions to do so? Well, I believe he did do so. Where he erred was he did not reach a determination, Your Honor, that the case was not risky, that the billing rates of the firm were unreasonable, or that we didn't come into the case expecting a risk enhancement. That's the way it was, and that certainly didn't change with respect to the appeal. Where he erred is that he failed to follow this court's requirements that in a case where those conditions are met, that a failure to apply a risk multiplier is an abuse of discretion. Thank you, Your Honor. Good morning, Your Honor. This is the court. I'm Ben Nutley here on behalf of the Schneider Objectors. With me at counsel's table is Mr. Joshua Furman and his associate counsel, John Zimmerman. They're with the Lukoff Objectors. I'd like to cede at least three minutes to Mr. Furman to come up and talk about some of the issues that he cares about, like the quantum merit award, and hopefully more if I can, unless you want me instead.  We cited in our answering brief, and this is in response to McGuire-Woods' argument, nine California cases, and this is between pages 31 and 39, and also 44 to 47. We cited nine California cases that the McGuire-Woods firm completely ignored. Those cases all dealt with concurrent conflicts of interest, and that's what we're talking about. We're not talking about successive representations where an attorney represents one person and then a couple years later represents somebody who's adverse to them. We're talking about an actual, active, concurrent representation that is prohibited, that was without consent and without non-informed consent. McGuire-Woods relies on Pringle. Why doesn't that control? Well, so many reasons. It's a mystery, and I'll tell you why I mentioned the nine cases. All of those California cases that we cited, they don't follow Pringle, and three of them are California Supreme Court cases. And they talk about, McGuire-Woods says, for example, Image Tech, which is the case that this court relied on initially, has been essentially overruled by intervening appellate authority, and that appellate authority is Pringle, they say. In fact, Image Tech relied on a case called Flat v. Superior Court, which is a California Supreme Court case from 1994. Before that, you had Comden v. Superior Court, another California Supreme Court case that talked about the forfeiture rule in the context of a concurrent conflicting representation. Flat was just discussed and adopted or used in In Re Charlisse C, which we talked about both of those on page 31 of our brief, which is the 2008 Cal Supreme Court case. So just right there, you can see that a case that involves not a real concurrent conflicting representation, that is an intermediate appellate court that is from back in 1999, it does not in any way abrogate Image Tech. It doesn't in any way abrogate the California cases that Image Tech relied on. Well, I think Pringle is being used to support the proposition that there are conflicts and there are conflicts. Some situations are of greater concern than others. Some situations are more obvious than others. McGuire-Woods is saying plainly it's a conflict. The court's determined it's a conflict, that's a violation. But viewed at the time, it's not one that every lawyer would have instantly recognized. Alarm bells go off. You can't do this. End of story. Why shouldn't we take a step back and say, well, okay, if Pringle suggests that there may be circumstances where the flat prohibition or forfeiture shouldn't be applied, start looking at the facts of the case and see what facts match closely to this one. Unfortunately, there aren't many cases whose facts appear to match closely to this one. And I've looked at the cases cited in your brief. There are a good number of them, but most of them are the alarm bell kind of cases where a lawyer should have known right from the get-go that there was a problem. What authority do we look to in a situation more like this one? Is there anything? Yes. Well, I think we've cited just about every one we could. The facts don't seem to match very closely. This seems to be a peculiar circumstance. It really is. There's no question this is a peculiar case, and you're not going to necessarily find one. But as I understand their rule, the rule they want to adopt is there is a harm requirement for a forfeiture if there's been harm or if there has been no harm. Well, they're suggesting, but first, factually, are you alleging that there was harm here? I mean, the prior panelists seem to suggest that it was harmless. I think there was the type of harm that is cognizable as harm in this context. There's no question about it. The payment of fees to objectors, eventually. The fact that there is a public question about whether that settlement was fair, in fact. Now, yes, Rodriguez 1 court comes and says it's adequate. It's fair for the purposes of approval. They surely didn't say, and everything's fine. He said it unequivocally, that this is fair, no matter how you slice it. That's right, and the Rodriguez court agreed. But the fairness of the settlement is not the same thing as there's no harm and therefore no foul. In fact, let me cite a case that we cited called Gilbert v. National Court for Housing, which is at 37 in our brief. And it actually came out a little later, the same year as Pringle. And it says, it distinguishes this situation. It says, you look for harm. You look for harm or egregious conduct in concurrent conflict cases only when there is a punitive or a possible informed written consent. In other words, if the attorney says, yeah, you're saying there's a conflict, but I have consent. I have a written consent. That is when you must have harm before there's a forfeiture. That's when you look at the harm. But if there's no consent and it is a pure conflict with no purported consent or waiver, that's a per se rule. That case, which again, unaccountably they don't mention, that case basically takes Pringle and tells Pringle, you don't apply to this case. You don't apply in the Rodriguez case. Because there was no written or other consent in the case. And it was an actual conflict. So you don't even need to look for harm. The harm is to the process. The harm is to the judicial process and to the clients. Then why didn't the Rodriguez one panel just say no fees? Probably because they didn't feel, I have no way of knowing what was in their mind, but maybe they felt it hadn't been adequately developed. That's certainly a possibility. And they wanted to send it back to have it developed. And the two cases they cited in respect to it, though, were not Pringle. The cases they cited were Image Tech, as we discussed, and Case v. Pacific Lumber, another federal case, that says the appearance of impropriety alone in a class action is enough. And that's another thing we haven't discussed. This is a class action. That takes it out to another stratosphere of conflict avoidance and the care we put into conflict. It's a class action, all right, and there have been objections. Objectors, all right, but nobody wants to set it aside and start anew. You mean from this point? From any point. At no time was there an objection, let's set this aside and start over. Set the what aside? The settlement agreement. There were objectors who were claiming that the settlement agreement should have been set aside. It's not going to differ in some way. Everybody had his own theories about how it should have differed. Yes, that's true. Go ahead. Okay. And so that is the fact that we are in a class action here takes us completely out of where Pringle is, certainly. And this is something that they just simply have not ever acknowledged, that these cases do say that. They do say that in class actions there need not be any harm when there's a concurrent. What's your bottom line on what we should do? The McGuire-Woods fee should be affirmed, in my view, as it is. And, you know, I'll let Mr. Furman come up here and talk about it. He wants to see the fee overturned because of the quantum merit. He doesn't feel that that should have been awarded. That is something that we argued against below. But at the same time, we told the district court we thought there was authority for giving the quantum merit the way he did. So we didn't appeal for that. So I would have to join Mr. Drackler's comment that I think everybody here, as far as we can tell, would like to have this resolved as soon as possible and without further appeals. The fewer proceedings we can have. Now, I know you're all sitting there saying, well, we only do what we do, and that's what we do. But there is authority, as Mr. Drackler said, for this court. Whatever it's going to want changed, if it could specify what it wants, that would be great, because otherwise we are potentially looking at a long time to go. And the problem with that is we have still class members waiting on some money because if the McGuire-Woods fee is affirmed in the way we think it ought to be, there's a second distribution that's going out to those class members, and they're waiting on that money. And it's a lot. So that is what we would ask. If there are no further questions. Good morning to the court. On behalf of the Lukoff Objectors, my name is Joshua Furman. To address a question that just came up, Judge Acuda asked, why does Pringle not apply here? And there's an important factual omission that hasn't come up yet in Pringle and that the McGuire-Woods attorneys are ignoring, and that's that the party from whom fees were being sought in Pringle had consented to the conflict. There was a written waiver. Both the individual and the company that were involved in Pringle had both signed it. The problem is that the individual also signed on behalf of the company. So when they went to go after fees after the individual to make those fees, that individual had signed the agreement, and that's an important part of where that Pringle holding comes from because that's where we get into this realm of technical violations versus actual violations. That individual, there's no violation vis-a-vis that individual. That's a very important point out of Pringle. Of course, we don't think Pringle applies in any event because the holdings that are relied upon there are thick. Pringle is a matter of there's just not enough in the record for overturning it. Now, there is a standard that's articulated in there, and we think that standard was applied and discussed quite thoroughly in the Fair v. Boccieri case, which we provided to the court in our Rule 28 letter. I think that that is just a striking case in the context of what's before the court right now. That case talks about what the importance is of harm in an attorney-client relationship where there's a natural conflict, and it says harm is not the issue that you look at. In Fair v. Boccieri, the client benefited quite a bit from the representation, so that's just not an issue because in Fair v. Boccieri, the attorney was not eligible for any fees, not only under the actual fee agreements that were entered into, but also under a quantum Merowith theory, and there's two important principles there. The attorney was not entitled to fees under quantum Merowith because the violation permeated the entire relationship between the client and the attorney, and because it was such an egregious violation of a prohibited act, a prohibited relationship, which had a statutory complement to it as well in Probate Code 16-004. That's almost the identical facts that we have before this court, and even if California Probate Code Section 16-004 does not apply here, California Probate Code Section 16-005 would. What does that say? You can't have two trusts that are conflicting with each other as a trustee. You can't represent two trusts that are in conflict. It's a prohibited act. So under the Fair analysis, we frankly think it begins in any Fair almost. So forfeiture is automatic. No ifs, ands, or buts. Forfeiture is automatic in an actual conflict case where there's not been waiver. Well, the district court also said even if we do the Pringle analysis, this is an egregious event. Is that a, and I guess the closing counsel says, well, that's just a substitute for the per se rule. Do you think there was any content to that beyond the per se rule that you're supporting? I don't think, I think the per se rule that McGuire-Woods criticizes is one that says where there's any ethical violation is a per se rule, and we don't subscribe to that. Huskinson, I think, makes it clear that that's not the case. We would say that there's egregiousness when the conflict goes to the, defies the very nature of what you'd expect from an attorney-client relationship, and that's, when the violation defies that very nature, that's a conflict every time. I'll back up very much. Did the defense counsel say anything about it when they resisted class certification? The defense counsel? There was defense counsel. And they, I mean, apparently there's not a dispute that the incentive agreement had been disclosed. It's on the table. They were trying to resist class certification. Yelling and screaming about that kind of conflict seems to be a natural, but nobody did. I think, Your Honor, that, I'll make one point. Maybe not the one that Your Honor's driving at, but I think that points to the importance of having objectors at the end of the day, because objectors did make a big deal out of this, even when class counsel and defense counsel did not. And objectors pointed to the solution. Does it also speak to the obviousness or perhaps the egregiousness of the violation? Not necessarily. Why not? If these kind of high-powered defense counsel don't pick up on it, doesn't that suggest that maybe it's not quite just a clearing problem? Well, because we don't know what the motivations are for defense counsel. Maybe they've decided that it's the time that defense counsel said, let's get rid of this case now. That's why we worry about collusion in class action settlements. That's why objectors come in and say that these are the issues we'd like to think about. But the settlement was done very late in the game. Classes had been certified, right? Sure. So you're suggesting the defense counsel decided, let's take a dive on class certification and get this case, we've got to, what, nine days before trial or something like that?  Well, I don't know why they did it, Your Honor. I don't know why they didn't catch it or why they didn't look to it. I do know that in the cases that we've seen, talking about a reasonable attorney standard, I have a hard time understanding where that comes from and how it applies here. It's a question now whether there's a conflict. The conflict was clearly presented. This panel certainly didn't, this court certainly didn't have any trouble identifying it. And it seems to be rather striking in the context of the cases that we do have. If I could address one last comment to the swirling appeal. Mr. Drackler has posed it to the court in the context that the court eliminated the multiplier and therefore didn't consider risk properly. It's true that the court said they're eliminating the multiplier. But what the ruling was, and the context of that order was, was saying that we're reducing the fees because of certain reasons. And the Hensley decision from the Supreme Court tells us what the standard is for that. This court has said in Moreno v. City of Sacramento that so long as those reasons are comprehensible, they're sufficient and there won't be an abuse of discretion in reducing the overall award, despite the fact that we're not pointing towards specific hours that we're making an across-the-board cut. What was that? I'm sorry. Go ahead. You know what might pose a problem, and you can tell me whether it does or does not. At the time, the multiplier was never a secret. Everybody knew about it, didn't they? That was in the original fee request. Right, in the original fee request. And this case was taken with the understanding that there would be a multiplier, I gather. Is that correct? Correct, I believe so. Now, today, after the fact, there's some problem with the multiplier. I think that was the question that somebody was asking you earlier. And I think that touching it in terms of the multiplier is an inaccurate statement of the court below's holding. The court below's holding was a cross-the-board reduction. The multiplier was used as a yardstick for that. It wasn't necessarily a cancellation of the multiplier. The court below did not say anything about risk. The court said there's too much billing. The court said you worked on another case, and you billed it to this case. The court said you billed to the class your efforts to keep your fee award. None of these things are proper. There's other practices that conferred no benefit to the class. Therefore, I'm cutting in this amount. Why isn't that an abuse of discretion to focus on an element that's specific to risk and using that to reduce excessive fees? That seems like a disconnect to me. It is. I certainly appreciate the court's point. And trying to read into how the court below came up with these numbers, it strikes a disconnect. But the rationale given for making the reduction clearly speaks to it's sufficient under the Moreno standard for a reduction of fees across the board. And I think it's unfortunate that the yardstick of the multiplier was used, but that wouldn't have made it any less proper if the court just said I'm reducing it in this percentage. Now, we've said if these three factors are present, it's an abuse of discretion not to use a multiplier. And opposing counsel says, well, those three factors were present. The district court made those findings. Do you disagree with that? Not necessarily. As I say, I think that this is not so much a matter of multiplier. This is a matter of an across-the-board reduction within the court's discretion. At the end of the day, the multiplier yardstick could have been stated in different terms. We could say that, in fact, the Lodestar was reduced much more and the multiplier was still applied, and we end up with a gross number at the end of the day. How we arrived at that gross number, as long as it's supported by a comprehensible statement, I don't think that the terms that the court uses to describe it is reducing the matter. Thank you. You can each have a minute. Just getting back to Justice Acuda's question about whether Pringle involves an actual conflict, at page 1002 of the opinion, they quote from the engagement letter, which refers to, quote, referring to the clients. They said that there was a waiver or consent. Is that incorrect? There was a consent by one of the parties, apparently. The other party, it got confusing. The court, however, had an alternative holding separate and apart from who had the right to raise the conflict. I believe that the party who raised the conflict had consented, but they raised it on behalf of the non-consenting party. But if you look at the court's opinion, they deal with the issue because they basically say, in the alternative, even putting that aside, this is not a case in which a forfeiture could be permitted because it doesn't rise to the level of a gross abuse which is required. And under California, that's good enough. Finally, and very quickly, to the extent that the court may be remanding or may be considering remanding this case, we would ask that the court, to the extent possible, include some legal conclusions. If it is sent back and our proposal based on our briefs is that there is no automatic forfeiture, that there was no violation of a clear rule because this was a case of first impression, and that the class has not been harmed as that term is used in the case law, which is specifically Pringle, and that this was not a case of egregious misconduct. Thank you. I want to say three short points. One is, I don't know how else to characterize Judge Reel's decision below, but he certainly held absolutely that he was eliminating the 1.75 multiplier, and that was separate and apart from the overall reduction in Lodestar. And in fact, as we pointed out, even if you took all of the objectors and Judge Reel's line items that mentioned either subsequent related litigation, which we were not part of, or attorney's fees, even though we were actually those entries related to fighting the objectors' request for fees and not supporting our own, if you totaled all of that up, that would be far less than the 10%. It would be less than 5%. And so whatever other concerns Judge Reel had were covered in that 10%. There simply was no basis, and it certainly was an abuse of discretion, as even my opponents can see, that when the shell factors are met, that a risk multiplier must be awarded. Finally, I want to say two things related. This court, we believe, again, does have the authority to modify a determination. I believe we cited to it, and others did, the Ayala v. Looney decision from 1994 specifically states that the court may affirm or modify or reverse or set aside or vacate. And we would ask that the court take such action so that it need not go back to the district court again. And I want to also correct a little bit of a misstatement that Mr. Nutley made. Regardless of how this court rules on the appeals, there is money available for a second distribution. If all of the fees are restored to McGuire Woods and to the swirling firm and it reaches the 25% cap, there still is money that is waiving, not a lot, but enough, that it will be worth making the distribution to the well over 120,000 claims that were received and received a partial distribution already. Thank you. Unless you have any other questions. We'll now move to the second set of cases. The parties shuffle around briefly. Good morning and may it please the Court. Ben Nutley for the Snyder Appellants. We feel pretty confident about the papers we submitted in connection with our request for attorneys. She's assuming that the judgment is upheld in substantially the form that it is now. I went back and did notice that the one thing that was a little bit eyebrow raising about our fee request at the time was that the amount was reflected about a 3.8 multiplier on what was then our LODESTAR. That's a little towards the high end of what courts award in this circuit for multipliers. What we would want to point out is that that was ancient history at this point because that was mid-remand. There was further briefing after that in remand and now this appeal. We took up the opposition of the McGuire-Woods appeal of their fee. It's not entirely clear why their co-counsel didn't, other than a sense of loyalty. After all, they did have an order that said that McGuire-Woods was in trouble and didn't get a fee and they should have, I think, given strong consideration. Maybe they did to coming up here and doing that themselves. In the absence of that, we came and defended the McGuire-Woods appeal. We spent a lot more time on it. I would just point out that although the multiplier was a little on the high side and that's the one thing that concerned me a little bit, that's no longer the case. What monetary amount are we looking at now? I think your application was, there's so many numbers floating around, I may be just out on this. It was like 1.7 million or something like that? That's very good. Which is substantially more than points of going to McGuire-Woods, who actually did the work that produced the funds, including the funds that you're seeking to be paid to yourselves. Something seems a little perverse here. 1.7 million? Well, at the same time, nobody disputes that that work the McGuire-Woods did was done. They did it. There's no question. There's a reason they're not getting paid. It doesn't have to do with how much I'm getting paid. There's a reason they're not getting paid what they billed. I don't look at that and say, well, gee, I've got to make it reasonable. What I'm asking for has to be bounded somehow by the fact that McGuire-Woods isn't getting paid. That's why I'm getting paid, that McGuire-Woods isn't getting paid. And we measured that fee request based on how much McGuire-Woods wasn't getting paid that was returned to the class. As a class action lawyer, I don't know how else to measure my fee. We thought it was a reasonable request given the difficulty of this. If it's true, I mean, I've heard this thing was a – I've heard now that this agreement was – you had to be a legal genius to understand that this was forbidden. I tend to disagree with that. I saw it in about three seconds after looking at the records. The judge real saw it pretty quickly. It's obvious. So obvious, then what was – Well, it's somewhere in between that. They say it wasn't obvious at all. If that's true, then I should be getting well-paid. I say they're exaggerating a little bit. It was obvious enough. But the fact is, in order to look at that agreement and see what's wrong with it, you do have to have substantial class action experience. You really have to know what you're doing. And whether that's a problem of McGuire Woods not having sufficient class action experience to be doing the job that it was doing, which is a class action, or I just got lucky, or maybe I'm just a genius. But either way, I think the fee request is reasonable under all the circumstances. And now, certainly looking back in time, one would say, okay, that was a lot of work after all. These guys have done the type of work that class action lawyers do over a course of years, resulting in benefits of the class. It's really no different from any other case. The notion that somehow objectors are this – McGuire Woods put forth this idea that objectors are some kind of second-class citizen. The judge doesn't have to explain their orders in respect to their fees. Not true at all. Not a single piece of authority for that. We're just like everybody else when it comes to a common fund. And, in fact, we're sort of the progenitors of the common fund theory way back when. So if there's any other questions, I'll be happy to address them. I do want to ask specifically – and this is one that I didn't focus on early enough – but the award based on the $325,000 savings to the class but not paying the incentive awards. Judge Riehl appeared to say, I'll give these two parties 5%. You split it 2.5% each. Was there any explanation as to where the 5% or 2.5% – 2.5% is half of 5%. Where the 5% comes from? No. Neither on the record nor – no. And it just seemed – it seemed to be a figure he had – clearly he had decided upon, but there was no rationale for why that was other than – the only criticism the judge offered or point the judge offered at that time was he thought that, in fact, we had misconstrued the – it's yet again this issue of the judge believing that he had, in fact, known about the agreements before and that the – then he disagreed subsequently with the Rodriguez opinion that said that we had – that the objectors had, in fact, brought these to his attention. I think the sense was, well, I've been told to pay you, but I still don't agree that these – that you brought these to my attention, so, therefore, you're getting a less fee. That's not what he said, but he said so little. That's the only thing you could interpret as being the reason other than that. The district court also said that it didn't need the help of the objectors to identify a conflict, the actual conflict of interest, and that McIntyre was entitled to seize. What did the district court mean by that? I honestly don't know. By then, we had already done some work identifying the conflict and telling the judge about it, that being the appeal, and in the end, we ended up doing some more work because the judge asked for a briefing on the quantum merit issue. There was lots of motions for rehearing – I'm sorry, reconsideration that we ended up briefing. I'm not sure if he thought that he didn't need the help and then ended up needing it and believing he needed it. Either way, he didn't think it was enough, in the end, obviously, to compensate us. But we feel like the record is very, very clear that we raised this issue, got it overturned on appeal. McIntyre's fees overturned on appeal, and the Rodriguez court said that we were responsible for the incentive award money, too. I'm not sure how the district court could persist in the belief that this was something that generated, from his own mind, this problem with the conflict of interest and the subsequent denial of the fee, because, after all, he approved of the fee in the first event, and we had to go and get it reversed on appeal. I think the trial court has an abiding conviction that this is the case, and just cannot be convinced otherwise. We definitely tried. Now, I guess I would also, to rip off Mr. Drackler again, we cited the Centroid case. This is imparting on our brief. We pointed out that this court can take attorney's fees and decide them itself. The Centroid case was a class action out of the Seventh Circuit, and I wanted to try to provide some additional authority. There's a case called Oren v. Astru, 511 Fed 3rd, 1217, 9th Circuit, 2008, which cited this circuit, which is a case in which they set forth the factors that courts of appeal can determine whether or not to award attorney's fees for work other than done in front of them on appeal, when they have a case in front of them. And among there are whether the nature of the panel's decision on the merits mitigates against transferring the request to the district court, and also whether particular courts of action that request for attorney's fees should not result in a second major litigation. And I suspect that we're going to end up going towards a whole other round of appeals unless we get some very, very final and unequivocal rulings from this court. Not that they have been equivocal before, but there's many, many parties on this side, each of whom has a knack for interpreting the words of this court in its own way. So that's our parting request. If there's any other questions, I'll be happy to answer them. Thanks. Good afternoon. May it please the Court, my name is Leslie Worland from McGuire Woods Class Counsel. I'd like to cede two minutes to Mr. Gockler if he has anything to add. Your Honors, the subject of this second appeal is the 2009 appeal on the issue of the incentive awards and the 2010 appeal on the issue of fees on appeal and on remand. And I just want to work backwards a little bit from a couple of questions that the panel had. One was, did Judge Real articulate anywhere his decision about the 5% to be split among the objectors? And there is a discussion. Judge Real did say, and he clearly expressly considered it, upon considering the extent of the objectors' added value, By their contribution to the denial of the incentive award, this Court finds attorneys' fees of 5% to be reasonable. To the extent Judge Real did articulate it, he clearly focused on it and made a finding to the extent that the objectors added value. And we think that that would be sufficient. The other point which I'd like to address, this goes to the 2010 appeal. And we think that the 2010 appeal, Judge Real's decision should be affirmed for three reasons. One is, if the Court determines that the McGuire-Woods appeal should be reinstated, we think that this appeal becomes moot. Because really there has been no benefit to the class. Secondly, I think there is a significant issue of subject matter jurisdiction which I'd like to address, which is something that we addressed in our brief. And third, and I can address this if the Court would like, we don't think that Judge Real abused his discretion in the decision that he made below. Let me address the issue of subject matter jurisdiction, because I think it directly affects the objectors that the Court has allowed on argument here, that is the Schneider head objectors. The reason that we believe that there is no subject matter jurisdiction here, and I would concede that this is not yet well developed in the record, but it is certainly alluded to, is that our information from the claims administrator is that none of the Schneider head objectors filed a claim. And because they did not file a claim, we believe that this case basically comes directly within the rule that this Court discussed in the Nicely case. Now, Nicely was not exactly all square on point, because Nicely the issue was, could the objecting party participate in any reduction in class counsel fees, which would go back into the pot. However, it is directly on point, because what Nicely said is, in that case, the person cannot participate, and therefore there is no Article III redressable injury, because by not making a claim, the settlement agreement in that case expressly says, if you don't make a claim, you've waived any right to participate in the common fund. The settlement agreement in this case says exactly the same thing. The settlement agreement says, any class member who fails to submit a claim shall be forever barred from receiving any payment pursuant to this stipulation or the settlement unless, by order of the Court, a later submitted claim form by such member is approved. No such claim form was ever made. Therefore, what happens in this case? Where can the objector's fees come from in this case? There is only one place those attorney's fees can come from, and that is from the fund. That is from the pot. What happens when the objector's clients don't make a claim? There cannot be any redress. One of the issues that was raised on the reply brief was that there should be some different standard or some different analysis applied, because really here the people that are raising the appeal are the attorneys, not the client. But I would submit to the Court that the lawyer cannot stand in any better shoes than the client can, and if the client destroys the underlying basis for the fee award to the attorney, that would be an issue between the attorney and the client. But if the client fails to make a claim and eschews any recovery from the pot, the lawyer stands in no better position. And I think it is a slight extension of nicely to adopt that argument, but I think it is an inevitable extension of nicely to adopt that argument. And both in nicely and in other decisions, this Court has said that it is not enough that there be a claim that the class member can make. Rather, there must be an ability to redress that claim. And the way that the nicely Court expressed it was that a disgruntled class member may have a viable, equitable claim against class counsel does not mean that a successful appeal will provide redress. A plaintiff must demonstrate standing separately for each form of relief sought. We don't think that there is any standing. We think it is clear from nicely, which sets forth a rule, that if you don't make a claim, you cannot participate. One of the points that was raised in reply was that the Court could make such an award based on the Court's ancillary jurisdiction, the cooter jurisdiction that hangs over after a case is dismissed. Except, in nicely, the Court addressed that issue also. And in nicely, in footnote one, the Court said, while there may be ancillary jurisdiction, the issue of whether the appellant has standing is an issue that is an Article III issue that must be separately addressed. And we're asking that if it is separately addressed, the Court would have to find no standing. Now, I would join with all of the counsel who've come to the podium and would say we are not asking for this matter to be remanded on the jurisdictional issue. We think that this Court, by its own pronouncements in other cases, including the Glasser case, which we cited in our appellate brief, says that a court can and indeed must resolve issues or must resolve doubts as to jurisdiction. And we think that that can be accomplished in one of two ways. One is that we be permitted to supplement the record on this issue of whether a claim has been made. Or two, to make a motion, to be permitted to make a motion to the Court to dismiss for lack of jurisdiction. But we think it is an issue that must be addressed, that the Court has an obligation to examine. And obviously, under existing case law, it's an issue that is never waived and can be raised at any time. On the other points, I would simply say very, very briefly, that the District Court, we believe, on the other points, did not abuse its discretion. Judge Reel determined that the contributions that had been made to the objectors was extremely limited. He so expressed it. We think, within the broad discretion that he has, that that finding should be upheld. Thank you. I've ceded two minutes to Mr. Beck. Good morning again, Your Honors. Unless it's this afternoon already. A few more minutes. Right out until morning. Okay. The only point that I want to make is that, with respect to your question before, Judge Okuda, regarding the why the 5%, if that was your question. It's correct. We're plangible. Judge Reel did make, as my colleague stated, did complete an analysis. He had before him the record, which indicated, by the way, that he had those incentive agreements at the preliminary approval stage. They were part of the record at that time. That was well before any objector appeared. And to the extent that the objectors raised an issue at the final approval hearing, and the judge reacted, what the judge said afterwards on remand was that, first of all, he felt that the objectors had misrepresented his position to the Ninth Circuit, but that he did take the Ninth Circuit's remand to heart and went and considered what was involved in that determination with respect to the elimination of the $325,000 in incentive awards. And there isn't going to be much more unless we want to question or crawl into the mind of Judge Reel as to he is into the best position to determine how much of that decision came from him and how much of it came from others. I would also point out that one of those objectors who obtained a result, 2.5%, did not appeal here. And so even if there were to be a reconsideration of fees, you would, I think, be constrained to some extent by that decision having become fine. Other than that, unless the panel has any additional questions, I don't think I have anything to add. Thank you. Mr. Nutley, does your client have standing? Absolutely. I think we addressed the Knisley line of decisions, which really, really absolutely are limited. This notion that there's a Knisley revolution going to happen here and it's going to be rolled out across all standing decisions around the world is not going to happen. As we described, that is really a very narrow, narrow exception to an exception to the ability to challenge class counsel's fee below. It is not on the record, by the way, whether or not our clients filed claims. I heard an offer to put it on the record. It's awful late in the day for that, but certainly we would like to brief this issue. If this is going to become a motion, we would brief the heck out of this. There's a case called U.S. Parole Commission v. Garrity, a U.S. Supreme Court case, 445 U.S. 388. That's a 1980 case. It talks about in the class context when claims expire, when a class member's claims expire involuntarily, did the class representative still have the ability to come in and complain about to appeal from a denial of class certification? They did, and their reason is that the class representative maintained at least an interest in spreading litigation costs and shifting fees and expenses to the other litigants with similar claims. That's exactly what has happened here. There's also the rule that fee disputes survive. There's ancillary jurisdiction over fee disputes. Even after a case is moot, even after a case is long gone, the federal appellate courts have this jurisdiction over any fee dispute that arises. And so the courts such as Reiser v. Del Monte Properties, 605 Fed Second 1135, that's a Ninth Circuit case, in all of those cases there is jurisdiction. And why would it matter in any event? What your client has done subsequent to the case, you've got a fee claim, you've already pressed it in front of the court, we're already on appeal. Why on earth would it matter what the client had done or not done possibly at some point sometime before, relating to their own claim and trying to get money from the fund? Bear in mind, if we prevail, one of the nicely issues was there was no personal stake for the client, because even if the client won, even if the plaintiff won the challenge to the class plaintiff's attorney's fees, they wouldn't get any money because they didn't claim against the fund that would be augmented by it. Here, we're trying to take money from the fund. Our client having an interest in the fund by having made a claim, we would be taking money out of our client's pocket if we win the fee, not putting money back in. It sounds to me like there's a conflict here. Well, we could never have standing if that was the case. We have four court articles. If that were the case, we could never have standing. And that's clearly not the case. This is a misapplication of my idea. I'd be happy to brief you more, but I don't think it really is necessary. Thank you. I thank all counsel for your argument. This set of cases just argued are submitted and adjourned for the day. Thank you.
judges: Farris, Clifton, Ikuta